**Donna G. BROWN, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. 96–3342–CV–S–BC–SSA.**

United States District Court,
W.D. Missouri,
Southern Division.

Feb. 2, 1998.

Lawrence E. Ray, St. Robert, MO, for Plaintiff.

Jerry L. Short, U.S. Atty.'s Office, Kansas City, MO, for Defendant.

### *ORDER*

LARSEN, United States Magistrate Judge.

Before the court is plaintiff's motion for summary judgment or, in the alternative, for a remand on the grounds that the ALJ failed to consider all of plaintiff's impairments or consider the combined effect of all of plaintiff's impairments and the ALJ failed to obtain testimony of a vocational expert. I find that the ALJ's decision is not supported by substantial evidence in the record because the record contains a residual functional capacity assessment of a treating physician which differs markedly from the assessment relied upon by the ALJ (prepared by a nontreating pediatrician). Therefore, the decision of the ALJ is reversed and this case will be remanded as directed below.

## I. BACKGROUND

On December 16, 1994, plaintiff filed for supplemental security income under title XVI of the Social Security Act (Tr. at 77–79). In that application, plaintiff alleged that she has been disabled since December 1, 1990, due to a combination of back pain, neck pain, obesity, high blood pressure, Grave's disease (a disease associated with the thyroid that affects the eyes), incontinence, migraine headaches, and hand pain and numbness. Her application was denied by the Social Security Administration both initially and on reconsideration (Tr. at 62–67; 47–51).

On October 22, 1995, a hearing was held before an administrative law judge ("ALJ") during which plaintiff and her daughter testified (Tr. at 25–44). Based on this testimony and the exhibits admitted at the hearing, the ALJ found on January 9, 1996, that plaintiff is not disabled and is not entitled to benefits (Tr. at 10–14). An appeal was taken to the Appeals Council who declined to review the ALJ's decision on July 8, 1996 (Tr. at 3–4). Therefore, the ALJ's opinion stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir.1997); *Andler v. Chater*, 100 F.3d 1389, 1392 (8th Cir.1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir.1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradic-

tory." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987) (citing *Steadman v. Securities & Exchange Commission*, 450 U.S. 91, 99, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401; *Jernigan v. Sullivan*, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposition decision." *Id.*; *Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir.1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. *Griffon v. Bowen*, 856 F.2d 1150, 1153–54 (8th Cir. 1988); *McMillian v. Schweiker*, 697 F.2d 215, 220–21 (8th Cir.1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, *et seq.* The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant engaged in substantial gainful employment?

Yes= not disabled.

No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

No = not disabled.

Yes= go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

Yes= disabled.

No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.

Yes= go not next step where burden shifts to the Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

Yes= disabled.

No = not disabled.

### IV. THE ALJ's DECISION

On January 9, 1996, the ALJ filed his decision finding that plaintiff is not disabled as defined by the Social Security Act. Essentially, the ALJ found that plaintiff's medical complaints are not supported by the medical evidence and that plaintiff's subjective complaints of disability are not credible. The ALJ found that although plaintiff is unable to perform her past relevant work as a dog groomer, she has the residual functional capacity for the full range of light work with the exception of frequent overhead reaching. The ALJ relied on Section 416.969 of Regulations No. 16 and Rules 202.17 and 202.118, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 to determine that there are other jobs in the economy which plaintiff can perform. Therefore, plaintiff was denied benefits at the fifth step of the sequential analysis.

On the question of medical condition, the ALJ noted that plaintiff has multiple physical complaints but that the medical evidence does not support the conclusion of disability. In support of this finding, the ALJ made two points: (1) plaintiff made no complaints of pain in the neck, back, wrist or hand until January 1995; and, (2) there are no clinical findings to show that the depression experienced by plaintiff is disabling (Tr. at 11).

On the question of plaintiff's credibility, the ALJ noted that plaintiff's subjective complaints may form an adequate basis to support a finding of disability unless there is a reason to question and discount those complaints. Here, the ALJ found four factors that led him to discount plaintiff's subjective complaints: (1) plaintiff has a poor work history, having earned little to nothing over a 20–year period; (2) plaintiff's allegedly debilitating migraine headaches are not supported by the medical records, and plaintiff's ability to read and watch television for extended periods appear unaffected; (3) the disabling effects of her combined complaints as alleged by plaintiff do not materially limit her daily activities; and (4) plaintiff's alleged functional limitations are not supported by the medical evidence (Tr. at 12).

Based on this analysis, the ALJ concluded that plaintiff is capable of performing work at the light exertion level and is therefore not disabled under the Social Security Act (Tr. at 12–14).

### V. THE RECORD

The record includes plaintiff's medical records, an earnings statement, a disability report, a vocational report, an adult daily activities questionnaire, a third party daily activities questionnaire, a physical examination for disability determination, two psychiatric review technique forms, a residual functional capacity assessment form, and the transcript of plaintiff's and her daughter's testimony at the administrative hearing.

### A. THE MEDICAL RECORDS

The following medical records were before the ALJ or the Appeals Council, or both, before plaintiff's application, for benefits was finally denied by the Social Security Administration.

### 1. Goodman Medical Center

On July 21, 1993, plaintiff was seen by Dennis S. Goodman, D.O. Plaintiff com-

plained that she had been suffering from joint pain and immobility for about 3 or 4 years (Tr. at 128).

On August 23, 1993, plaintiff returned to the Goodman Medical Center complaining of a lump in her right breast. She was treated with antibiotics and had a biopsy performed on September 1, 1993. The pathology report showed evidence of an irritated right lipma. Plaintiff recovered from that in-office surgical procedure without complications (Tr. at 128).

On September 3, 1993, plaintiff saw Dr. Goodman complaining of persistent headaches and swelling on the right side of her neck. The doctor found tension cephalgia (headaches), and plaintiff was treated conservatively[1] (Tr. at 128).

On February 21, 1994, plaintiff was seen by Dr. Goodman. She was again complaining of swelling in the neck area and facial pain. Dr. Goodman found signs of bronchitis and treated plaintiff with antibiotics and anti-inflammatories (Tr. at 128).

On March 3, 1994, plaintiff returned to the Goodman Medical Center. Her blood pressure was 150/100, and she was treated appropriately[2] (Tr. at 128).

On September 14, 1994, plaintiff was treated by Dr. Goodman for bronchitis (Tr. at 129), and on October 4, 1994, and December 7, 1994, plaintiff was treated for a urinary infection (Tr. at 129).

On January 1, 1995, Dr. Goodman wrote to the section of disability determinations reporting that plaintiff had been a patient since July 21, 1993. According to Dr. Goodman, plaintiff has a history of Grave's disease, depression and hypertension; she suffers from neck and back pain; and pain, numbness and tingling in the lower extremity. Dr. Goodman also reported recent visits for minor urinary symptoms (Tr. at 5A).

On January 4, 1995, Dr. Goodman performed a disability evaluation on plaintiff for the Division of Family Services. In that evaluation, Dr. Goodman reported that plain-tiff's claimed disability results from neck, back, wrist and hand pain, and from persistent headache secondary to muscle spasms, and tightness and arthritic changes in the neck. He reported that plaintiff is unable to rise from a chair, is unable to squat without pain, and is unable to raise her arms above the shoulder level. Her forward bending was reported as limited to 40–45 degrees, and her backward bending was reported as limited to 15 degrees. Plaintiff's grip strength was reported as 2 over 5 for her right hand and 3.5 over 5 for her left hand (Tr. at 129).

### 2. University Hospital and Clinics

On August 17, 1995, plaintiff saw Robert R. Conway, M.D. for a follow-up and blood work and thyroid studies. She complained that her pain was worse and that she was sleeping less than an hour and a half a night. She reported her main complaint to be her neck and back. According to the medical notes:

> The patient describes her pain as diffuse over her back and neck. She is stiff in the morning. She swells up in her joints, her left elbow and bilateral knees as well as her feet. She also states that she gets edema in her joints at nights. Nothing can release the pain, and it is constant and a dull ache (Tr. at 116).

Dr. Conway's physical examination showed a slightly depressed and aggravated patient with a "full range of motion in all of her joints with no synovium or fluid present in any of her joint spaces" (Tr. at 116). Dr. Conway observed tender points in plaintiff's plantar fascia (bottoms of her feet) bilaterally and the first "PIP" (proximal interphalangeal) joint tendons. Although plaintiff had tender palpitation over her back, the number of such points had decreased from an earlier examination. Most of the tender points were found in the upper traps (trapeziums or the middle back) and supraspinatus area (upper back area) bilaterally and in the "OA" (occipital anterior) joint of her neck (Tr. at 116).

---

1. The records do not indicate how plaintiff was treated. The doctor merely wrote "[s]he was treated in a conservative manner."

2. Once again, the doctor merely wrote in his records "Appropriate treatment was given. Appropriate counseling was done."

Dr. Conway assessed plaintiff as possibly suffering from hypothyroidism, possible rheumatoid arthritis, depression and hypertension. He prescribed an increase in imipramine (a drug for depression), some physical therapy, and redoing plaintiff's blood work (Tr. at 116–117).

On August 23, 1995, plaintiff returned to the clinic for treatment for fibromyalgia[3]. Dr. Conway reported that plaintiff's thyroid studies turned out normal. Again, he observed multiple tender points. As treatment, Dr. Conway gave plaintiff a brochure on fibromyalgia and prescribed Flexeril (a drug prescribed for skeletal muscle spasm). He also recommended that plaintiff begin a regular walking program and get physical therapy instruction in flexibility (Tr. at 118).

**(The following medical reports were presumably not available to the ALJ.)**

On January 8, 1996, plaintiff returned to the clinic "for establishment of service and for med refills" (Tr. at 133). From the physical examination, Sandra Kwan, M.D., reported that "[g]enerally, the pt is an obese woman in no acute distress" (Tr. at 133) Dr. Kwan continued plaintiff on her same medications, requested her medical records, and scheduled a return visit in three months (Tr. at 133).

On February 16, 1996, plaintiff returned to the clinic for her follow-up visit. Plaintiff complained of depression, failure of sleep, poor concentration, and memory loss. Dr. Kwan observed that plaintiff was in no acute distress but had continued tenderness in her back over bilateral costovertebral (relating to the ribs and thoracic vertebrae) angles (Tr. at 134).

On March 5, 1996, plaintiff returned to the clinic due to multiple health problems. Plaintiff was admitted for observation to rule out "MI" (heart attack) (Tr. at 134).

On March 11, 1996, plaintiff was seen on a follow-up visit. She had been released from the hospital on March 6, 1996, when her chest pain subsided and her feet became less swollen. John Mruzik, M.D., refilled plaintiff's medications, ordered an echocardiogram to evaluate her cardiac function, and discussed various treatment modalities including exercise, stretching and sleep improvement. Dr. Mruzik recommended plaintiff start to exercise gradually (Tr. at 136).

On May 3, 1996, Dr. Mruzik (operating as Family Medicine Clinic at Green Meadows) prepared a physician's certification of permanent and total disability. In that document, Dr. Mruzik diagnosed plaintiff as having fibromyalgia, undifferentiated. connective tissue disorder, and carpal tunnel syndrome. Dr. Mruzik opined that plaintiff is eligible for medical assistance (Tr. at 137).

In the medical source statement, Dr. Mruzik reported that plaintiff retains the strength frequently to lift 10 pounds; occasionally lift 10 pounds; stand or walk for 2 hours (30 minutes continuously); sit for 2 hours (1 hour continuously); and push and pull on a limited basis because of muscular pain. Dr. Mruzik reported that plaintiff had no restrictions on climbing, balancing, stooping, kneeling, crouching, or bending. He also reported that plaintiff is unabridged in handling, fingering, feeling, seeing, hearing, and speaking. He reported restrictions only in the area of reaching. In describing the basis for impaired activities, Dr. Mruzik wrote: "Frequent muscular-skeletal pain" (Tr. at 139). In support of his conclusions, Dr. Mruzik reported that plaintiff has an elevated ESR (erythrocyte sedimentation rate) and "PANA 1:640"[4]. Based on this assessment, the doctor concluded that plain-

---

**3.** Fibromyalgia (or fibrositis) consists of a constellation of symptoms associated with few physical findings and essentially normal laboratory tests. The disease primarily affects women. Its cause is unknown. The main complaints include joint and muscle pain and stiffness, easy fatigability, and difficulty with sleep. The symptoms usually appear insidiously, although some patients may recall a precipitating physical or emotional event. There is usually a significant degree of functional impairment with inability to

work or difficulty with chores at home. Textbook of Family Practice by Robert E. Rakel, M.D., Fifth Edition, page 1035, W.B. Saunders Company.

**4.** I have no idea what "PANA 1:640" means. It may actually be "FANA" which stands for fluorescent antinuclear antibody, but I cannot be certain.

tiff is physically unable to work at any job and is totally disabled (Tr. at 139).

## B. ADMINISTRATIVE RECORDS

The following administrative records were before the ALJ before the issuance of his decision on January 9, 1996.

### 1. Earnings Statement

According to plaintiff's earning statement, she made the following income for the period between 1967 and 1984:

| | |
|---|---|
| 1967 | $1,642.79 |
| 1968 | $3,315.89 |
| 1969 | $3,847.60 |
| 1970 | $3,652.80 |
| 1971 | $3,211.77 |
| 1972 | $ 948.87 |
| 1973 | $ 55.20 |
| 1974 | $ 376.87 |
| 1977 | $ 480.24 |
| 1984 | $2,109.26 (Tr. at 87). |

### 2. Disability Report

On December 11, 1994, plaintiff completed a Disability Report. In that report, plaintiff complained that her disabling condition involves pain and stiffness in her back and neck; obesity; high blood pressure; Grave's disease; incontinence; migraines; and numb hands (Tr. at 108). As to why she is not able to work, plaintiff reported that she has a lot of pain and cannot move around much (Tr. at 108).

As to her daily activities, plaintiff reported that she cooks about 3 times per week, she watches television 6 hours a day, and she listens to the radio. She reported that she no longer does housework, she no longer does her laundry, she no longer reads because of her migraines, she has no social contacts other than her daughter, and she has not driven a car in 3 years because of migraines and poor reflexes (Tr. at 111).

As to past employment, plaintiff indicated that she had been self-employed for 20 years as a pet groomer (Tr. at 112). She reported working 6 days a week and earning 15 dollars per hour for the period between August 1967 and June 1987 (Tr. at 112). According to plaintiff, she did all the grooming, performed the bookkeeping tasks, made appointments, and answered the phone (Tr. at 112).

Plaintiff concluded by indicating that she can no longer lift weight without pain, she cannot do much writing because of pain in her hands, she gets depressed and irritable because of the pain and accordingly can no longer deal with the public, and she takes medication that causes spells of "dizziness" and a feeling of being drugged (Tr. at 113).

On December 16, 1994, an interviewer for the Social Security Administration reported that plaintiff complained that sitting in a chair makes her back hurt, that plaintiff appeared to experience pain as she raised her right arm to remove a sweatshirt, and that plaintiff walked slowly and stiffly (Tr. at 115).

### 3. Vocational Report

On December 30, 1994, plaintiff prepared a vocational report detailing her work history. In that report, plaintiff listed her past employment as a pet groomer for the period June 1967 to June 1987. She recorded that she worked about 6 days a week, and she first earned $1.95 an hour (6/67–4/72) and later 50% commission (1/80–6/87) (Tr. at 81). She described the work as involving the physical ability to walk 8 hours a day, stand 7 hours a day, sit 1 hour a day, bend constantly, and lift between 50 and 100 pounds (Tr. at 83). In her concluding remarks, plaintiff reported that she is no longer able to work with the public; she cannot use scissors because of the pain in her wrists, hands, and neck; and she has gained about 100 pounds since she stopped working which aggravates her condition and depresses her (Tr. at 86).

### 4. Adult Daily Activities Questionnaire

On December 30, 1994, plaintiff completed a questionnaire about her daily activities. In that document, plaintiff reported that she occasionally does cooking and laundry, she occasionally performs household chores, and she occasionally goes shopping. On the whole, however, plaintiff reported that these activities are performed by others (Tr. at 96). For amusement, plaintiff indicated that she occasionally reads, she listens to the radio and watches television considerably, and may occasionally work puzzles (Tr. at 97). Plaintiff's social life was reported as minimal because of depression (Tr. at 97–98). Plaintiff

reported that she seldom sleeps, she is unable to care for her personal needs, and she is unable to concentrate—all as a result of pain and headaches (Tr. at 98).

Concerning the pain, plaintiff did not recall a starting point but indicated that it is constant and getting worse (Tr. at 99). Her pain is more intense in the evenings and somewhat exacerbated by cold weather (Tr. at 99). Plaintiff reported that she takes the following medications for her pain: ibuprofen, darvocet, lorcet, and aspirin (Tr. at 99). According to plaintiff, her pain restricts her movement, prevents her from returning to past activities such as swimming, and causes her to lose sleep (Tr. at 99–100).

### 5. Third Party Daily Activities Questionnaire

On January 15, 1995, plaintiff's daughter, Kristi Naillon, completed a questionnaire about her mother's daily activities. In that document, Naillon reported that plaintiff does some cooking and laundry, she does some shopping for essentials, and occasionally she prepares her own meals (Tr. at 93). Naillon indicated that most of these listed tasks are routinely performed by her (Tr. at 93). As to plaintiff's limitations, Naillon reported that plaintiff has difficulty stooping, squatting and bending over; and plaintiff is unable to stand or walk for any length of time (Tr. at 93). Naillon observed that plaintiff reads only about 2 hours a week, she watches television about 6 hours a day, and she listens to the radio about 6 hours per day (Tr. at 94). According to Naillon, plaintiff rarely socializes, she sleeps a maximum of 4 hours a night, and generally she does not feel well enough to care much about her appearance (Tr. at 95).

### 6. Internal Medicine Consultants, Inc.

On February 16, 1995, Lisa G. Kolb, M.D., prepared a medical history and physical ex-

amination for the disability determination unit in Jefferson City, Missouri. As to her findings, Dr. Kolb listed the following possible medical problems: musculoskeletal neck and back pain, migraine headaches, possible hypothyroidism with vague history of Grave's disease, hypertension (adequately controlled), obesity, mild stress incontinence, mild depression, and chronic urinary tract infections (Tr. at 122). As a treatment plan, the doctor wrote:

1. I recommend TSH (thyroid stimulating hormone) to define the extent of her thyroid disease, CBC (complete blood work) and diagnostic profile for general health screening.

2. X-rays of the neck and back to define degenerative joint diseases.

3. She would benefit from only-term suppressive antibiotics and surveillance cultures to document adequate treatment of urinary tract infections (Tr. at 122).

### 7. Psychiatric Review Technique

On May 29, 1995, a psychologist (whose name, qualifications and the basis for his/her opinions are indiscernible from the record) opined that plaintiff has mild depression (Tr. at 71). According to this record, the implications of this depression on plaintiff's life are slight (Tr. at 75).[5]

### 8. Residual Physical Functional Capacity Assessment

On June 9, 1995, Woodard C. Riley, M.D., reviewed "the evidence in the file" and affirmed the residual functional capacity assessment (Tr. at 52). I assume that Dr. Riley affirmed the opinion of George L. McElroy, III, M.D., who apparently completed the checklist (Tr. at 59).

---

5. This is the type of information prepared by the government in anticipation of litigation that is of very little value to a judge. I would think that the government, if it continues to spend money on such reports, might consider including in the record the expert's credentials, a listing of the materials provided to the expert, and some indication as to whether the expert actually saw the claimant. In addition, it would be extremely

helpful for the expert either to write legibly or type the report and, in doing so, avoid abbreviations and technical jargon. In this report, the most I can glean from the record is that a Ph.D. looked at something and came up with an opinion as to plaintiff's mental condition. I cannot even tell whether this individual had a Ph.D. in psychology or physics.

Much of this report is unintelligible. I can tell that Dr. McElroy found that plaintiff could occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, stand or walk about 6 hours in an 8–hour day, and push and pull with limitations in her upper extremities (Tr. at 53). Dr. McElroy also found that plaintiff could only occasionally climb, balance, and stoop (Tr. at 54). Finally, Dr. McElroy opined that plaintiff should avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards (e.g., machinery and heights) (Tr. at 56).[6]

### 9. OHA Psychiatric Review Technique Form

On January 9, 1996 (the date of the ALJ's decision), the ALJ completed a psychiatric review form recording plaintiff's mental health problem as affective disorder and rated the severity of the impairment as slight or inconsequential (Tr. at 15. 17). Again, I cannot tell from this form the information providing the basis for this conclusion by the ALJ.

## VI.  THE ADMINISTRATIVE HEARING

On October 22, 1995, the ALJ conducted an administrative hearing during which he heard the testimony of plaintiff and her daughter.

### A.  PLAINTIFF'S TESTIMONY

Plaintiff testified that at the time of the hearing she was 46 years old, a widow, and has a 10th grade education (Tr. at 28).

#### 1.  Work History

According to plaintiff, she attended dog grooming school in 1967 (Tr. at 29). She worked only in the area of dog grooming, which lasted about 15 years; and she stopped working in 1987 (Tr. at 29–30).

#### 2.  Medical Conditions

Plaintiff testified that she has carpal tunnel syndrome in both hands. She stated that this condition is painful, that she lacks dexterity in her fingers, and that she wears braces 24 hours a day. Although the braces prevent numbness in her hands, plaintiff reported that the pain is not relieved (Tr. at 30). This condition prevents her from performing dog grooming. In fact, it makes it difficult for her to drive a car or answer a telephone. According to plaintiff, she experiences pain in her wrists 18 out of 24 hours a day (Tr. at 31). On a scale of 1 to 10, plaintiff testified that the pain would rate "about a four" (Tr. at 32–33).

Plaintiff also testified that she suffers from arthritis and fibromyalgia (Tr. at 34). She indicated that she has arthritis in her joints and fibromyalgia in her neck, shoulders, arms, hands, back, hips, legs, and feet (Tr. at 35). Plaintiff reported her pain from these conditions is great, i.e., between 8 and 9 on a scale of 10 (Tr. at 36).

Plaintiff also reported that she suffers from Grave's disease, a condition of the thyroid. This condition, according to plaintiff, results in blurry vision. As a result, plaintiff indicated that she no longer drives a car (Tr. at 37). She reported that she has had Grave's disease for about 5 years but takes no medication for it (Tr. at 38).

Plaintiff also testified that she has lupus (a term used to depict erosion of the skin), which causes pain and discomfort and may be responsible for her kidney infections (Tr. at 38).

Plaintiff also complained that she has severe migraine headaches about twice a week (Tr. at 42).

#### 3.  Restrictions

Plaintiff testified that the pain from her medical conditions rates about a 9 on a scale from 1 to 10 (Tr. at 39). She indicated that she can sit for up to an hour before she feels pain, that she can lift and carry no more than a glass of water, and that she can walk only about 100 feet (Tr. at 39–40).

---

**6.** This is another example of a report that is of little value to me. Most of Dr. McElroy's writing is simply illegible. In addition, the most that I can tell from the record is that Dr. Riley and Dr. McElroy are medical doctors, and evidently Dr. Riley (the affirming physician) is a *pediatrician* (Tr. at 52). Plaintiff is a woman is her forties (Tr. at 28)

Plaintiff testified that she has difficulty sleeping—getting up about every hour—and she gets no more than 3 hours of sleep a night (Tr. at 40). She indicated that the pain wakes her from sleep (Tr. at 41).

Plaintiff indicated that she cannot stand for longer than 10 minutes, she cannot squat or kneel, and she is unable to reach with her arms (Tr. at 41).

According to plaintiff, her son and daughter do most of the work around her house (Tr. at 42–43).

### B. DAUGHTER'S TESTIMONY

Kristi Naillon, plaintiff's daughter, testified that plaintiff sometimes will fall asleep during conversations with the daughter. According to Naillon, this results from plaintiff's pain and discomfort (Tr. at 44).

## VII. ANALYSIS OF THE ALJ'S DECISION

The ALJ essentially found that there is no credible medical evidence in the file to support plaintiff's physical complaint of disability or depression [7] and that the plaintiff's testimony about the disabling nature of her pain is not believable.

### A. RELIABLE MEDICAL EVIDENCE OF DISABILITY

The ALJ recognized that plaintiff raises numerous medical complaints but concluded that "the medical evidence is not supportive of disability" (Tr. at 10). The ALJ made the following observations in support of this conclusion: (1) plaintiff had seen Dr. Dennis Goodman on multiple occasions but did not complain of neck, back, wrist, or hand pain until January 1995; (2) a February 1995 evaluation showed multiple tender points but the report was essentially negative; (3) plaintiff complained of only neck and back pain in an August 1995 examination, and that examination showed a decrease in tender points, no difficulty in straight leg raising, no rheumatoid arthritis nodules, a normal thyroid, splints relieving her hands, and medication

controlling her hypertension and stress incontinence (Tr. at 11).

First, the ALJ stated that plaintiff did not complain to Dr. Goodman of pain in her neck, back, wrist, or hand until January 1995. The record (which is really only Dr. Goodman's summary of plaintiff's medical records) does not support this conclusion. On July 21, 1993, plaintiff saw Dr. Goodman with "complaints of multiple areas of joint pain and immobility [which have] been present for the last three to four years" (Tr. at 128). On September 3, 1993, plaintiff saw Dr. Goodman complaining of constant headaches and swelling on the right side of her neck (Tr. at 128). On February 21, 1994, plaintiff saw Dr. Goodman for persistent swelling in the neck and facial pain (Tr. at 128). Finally, *on January 4, 1995,* Dr. Goodman performed a disability examination on plaintiff for the Division of Family Services in which he reported "[p]atient is claiming disability on neck, back, wrist, hand" (Tr. at 129). He went on to say that plaintiff has had persistent headaches secondary to "persistent muscle spasms, tightness, and arthritic changes in the neck" (Tr. at 129) A fair reading of this summarized record is that plaintiff reported these problems to Dr. Goodman before January 1995, and on January 4, 1995, he evaluated these medical conditions for the government.

Second, the ALJ observed that a February 1995 evaluation of plaintiff showed multiple tender points during her examination but the report was essentially negative. The ALJ was apparently referring to the February 16, 1995, evaluation by Lisa G. Kolb, M.D., which was performed for the disability determination unit. It is true that Dr. Kolb's report was essentially negative. It merely repeated the same impressions presented by other medical practitioners, i.e., musculoskeletal neck and back pain, migraine headaches, hypothyroidism, hypertension, obesity, mild stress incontinence, mild depression, and chronic urinary tract infections (Tr. at 122). However, it is also clear that Dr. Kolb wanted additional information to determine the

---

7. Plaintiff's counsel conceded at the administrative hearing that mental problems were not the cause of her disability, and he agreed with the ALJ that plaintiff did not need to be examined by a psychiatrist (Tr. at 44). Therefore, I do not address plaintiff's alleged depression.

nature and extent of plaintiff's medical conditions including thyroid stimulating hormone to define the extent of plaintiff's thyroid disease, x-rays to define plaintiff's degenerative joint diseases, and long-term suppression antibiotics to treat her urinary tract infections (Tr. at 122). This disability evaluation can best be described as just a first step in determining plaintiff's medical problems.

Third, the ALJ observed that plaintiff's August 1995 examination showed a decrease on tender points, no difficulty in straight leg raising, no rheumatoid arthritis, a normal thyroid, splints relieving her hands, and medication controlling her hypertension and incontinence. The ALJ is presumably referring to the August 17 and 23, 1995, evaluation and treatment performed by Dr. Robert R. Conway (Tr. at 116–118).

It is true that Dr. Conway reported a decrease in tender points; however, the earlier medical record to which he was referring is not included here and so it is impossible to tell whether this is a material change. In any case, on both occasions Dr. Conway reported multiple tender points (Tr. at 116, 118). It is also true that on August 17, 1995, plaintiff had "a negative straight leg raise" (Tr. at 116). However, since plaintiff's complaint was pain in her back and neck, it is difficult to understand the significance of this observation. Certainly, Dr. Conway drew no particular conclusion from this information. He simply reported it. It is also true that on August 17, 1995, Dr. Conway did not feel thyroid nodules or rheumatoid arthritic nodules; however, he assessed plaintiff as suffering from possible hypothyroidism and possible rheumatoid arthritis, and he ordered redo of her blood work and a thyroid profile including a thyroid stimulating hormone (Tr. at 116–117). On her next visit, August 23, 1995, Dr. Conway reported the normal thyroid study and concluded that plaintiff suffers from fibromyalgia (Tr. at 118). It is also true that Dr. Conway reported that splints were relieving numbness and tingling in plaintiff's hands, but she still complained of stiffness (Tr. at 118). And ironically, on

August 17, 1995, plaintiff became upset with Dr. Conway because her main complaint involved her back and neck, and she could not understand "why she is being treated for carpal tunnel" (Tr. at 116). As to hypertension and incontinence, there is nothing in Dr. Conway's notes that reflects medication controlling plaintiff's hypertension and stress incontinence.

The impression one is left with after reading this segment of the ALJ's opinion is that in August 1995, plaintiff was doing just fine. On the contrary, the medical records show a woman with severe pain in her neck and back, which at that time had lasted 3 to 4 weeks, and who had not been able to sleep despite a doubling of her medication. Dr. Conway concluded that plaintiff suffers from fibromyalgia, which is consistent with muscle and joint pain and stiffness reported by plaintiff. Therefore, there is medical evidence in the file supportive of plaintiff's complaints. The only question is whether the severity of her pain is such as to render plaintiff disabled.

## B. CREDIBILITY OF PLAINTIFF'S CLAIM OF DISABILITY

Next, the ALJ concluded that plaintiff's testimony about the disabling nature of her pain is not credible. In support of this conclusion, the ALJ noted that plaintiff has a poor work record; that plaintiff's complaint of migraine headaches is not supported by the medical records; that plaintiff's allegation of total disability is not reflected in her daily activities; and that although plaintiff alleges severe functional limitations, no physician has placed such restrictions on her (Tr. at 12).

Yes, it is true that plaintiff has a poor work record. However, without more, I fail to see how this makes plaintiff's testimony less credible. Plaintiff may well be lazy, but that does not necessarily make her a liar. The ALJ failed to determine why plaintiff's work record was poor; therefore, this observation does not support his determination that plaintiff was not credible.[8] *See Salts v.*

---

**8.** Plaintiff reported on her vocational report having worked five to six days per week for 20 years, yet her earnings records indicate that she earned

a total of $19,641.29 over an 18–year period. That averages $1,091.18 per year, or $20.98 per week over that 18–year period. The discrepan-

*Sullivan,* 958 F.2d 840, 845 (8th Cir.1992) ("The ALJ made no effort ... to determine why Salts's earnings were so low. Salts's history of low earnings could be interpreted as evidence that he was never able to perform substantial gainful activity over a period of time, or as evidence that he simply never wanted to work. The ALJ did not develop the record to a point where one can say that either of these possibilities is more likely than the other.").

It is also true that plaintiff had not specifically and regularly reported migraine headaches to her treating physicians. The record does show plaintiff reporting headaches to her physicians on September 3, 1993 (Tr. at 128), January 4, 1995 (Tr. at 129), and on February 16, 1995 (Tr. at 122). Again, so what? Plaintiff's main focus has been on the debilitating character of the pain experienced in her neck and back, not her migraine headaches. That pain has been specifically and regularly reported to her treating physicians.

Contrary to the ALJ's conclusions, it is not true that plaintiff's daily activities belie a person who is totally disabled. According to the ALJ, plaintiff cooks meals 3 to 4 times per week; plaintiff does dishes, dusts, washes her laundry, and shops with her daughter; plaintiff swims during the summer; and in February 1995, she walked a mile a day—keeping in mind that her physicians have instructed her to walk for exercise. On February 16, 1995, Dr. Lisa G. Kolb did, in fact, report this information to the government in a disability report as part of plaintiff's history (Tr. at 120).[9] However, the balance of the record here simply does not support this description of daily activities. For example:

1. On December 11, 1994, plaintiff reported that she cooks about 3 times per week for 2 people. She also reported that

she can no longer do housework, and she can no longer do laundry (Tr. at 111).

2. On December 30, 1994, plaintiff reported that she occasionally performs household chores and shopping, but most of the time these tasks are performed for her by family members (Tr. at 96).

3. On January 15, 1995, plaintiff's daughter reported that although plaintiff does some household tasks (including cooking and some shopping for essentials), most of these functions are performed by the daughter (Tr. at 93).

4. On October 22, 1995, plaintiff testified that her son and daughter do most of the work around her house (Tr. at 42–43).

5. On December 30, 1994, plaintiff reported that her back and neck pain restrict her movement and prevent her from performing past activities including swimming (Tr. at 99–100).

Except for Dr. Kolb's hearsay account of plaintiff's statements, the record reflects that plaintiff has consistently reported her daily activities as limited in the myriad of government forms plaintiff completed in seeking benefits and in her testimony at the administrative hearing.

Yes, it is true that no physician has placed functional restrictions on plaintiff amounting to total disability *at least as of the date the ALJ issued his decision on January 9, 1996.* However, the record before me includes a May 3, 1996, report by Dr. Mruzik which states that plaintiff Could frequently and occasionally lift 10 pounds, stand or walk for 2 hours, sit for 2 hours, and push/pull on a limited basis (Tr. at 138). Dr. Mruzik concluded that plaintiff is physically unable to work at any job and is totally disabled (Tr. at 139).

cies in these forms alone certainly tend to discredit plaintiff. However, since this case will be remanded on other issues, the ALJ will be directed to analyze more thoroughly plaintiff's credibility and indicate in his opinion the basis for his conclusion.

9. Dr. Kolb reported that "[s]he walks one mile in 1–1 ½ hours per day, owns a Nordic Track, but is not using it. Pain is relieved with swimming during the summer" (Tr. at 120). I find the

accuracy of this account to be suspect given plaintiff's contrary assertions both before and after her meeting with Dr. Kolb, the consistency with which plaintiff and her daughter had reported her limited daily activities, and the general unreasonableness to expect that a person applying for disability would describe walking for up to an hour and a half per day and swimming during the summer to a government-hired consultant.

The above analysis is not to suggest that plaintiff and her various claimed disorders and alleged disability are not suspect or, at least, subject to some legitimate questioning based on the record here. I can find several such instances that raise serious-questions about plaintiff's complaints and her alleged disability. However, the ALJ did not focus on those inconsistencies or problems in analyzing the case or discrediting plaintiff.

For example, plaintiff reported a history of Grave's disease. There is nothing in the record reflecting that a medical practitioner examined plaintiff, conducted appropriate tests for this disease, or diagnosed plaintiff as having Grave's disease. In fact, the record here shows that plaintiff's thyroid test was normal. Based on the fact that there is no medical evidence documenting such a medical condition and that subsequent laboratory findings showed no thyroid problem, a judge could reasonably and logically question and even doubt plaintiff's veracity when she claims that her back and neck problems (fibromyalgia) are causing disability. This conclusion becomes even more plausible when one factors in that fibromyalgia (plaintiff's major complaint) is a disease characterized by few physical findings and essentially normal laboratory tests. The fact that plaintiff had largely undocumented and unsubstantiated complaints about Grave's disease could cause a judge to conclude that her subsequent complaints about fibromyalgia are similarly not well-founded.

The same analysis also could be performed as to plaintiff's complaint about lupus. There is nothing in the file indicating that a doctor ever diagnosed or treated plaintiff for lupus. Given that lupus takes many forms, that it may be associated with a wide variety of diseases, and that none of the examining physicians here even mentioned the term in discussing plaintiff's medical conditions, it would not be unreasonable for a judge to question or suspect plaintiff's complaints of disabling neck and back pain based on the lack of support for her claimed lupus.

There are some rather obvious credibility problems with plaintiff's claimed work history which the ALJ alluded to but never developed. Plaintiff reported working for 20 years as a pet groomer earning $1.95 an hour (6/67–4/72) and 50% commission (1/80–6/87). She described the work as requiring the ability to walk 8 hours a day, stand 7 hours a day, and lift between 50 and 100 pounds (Tr. at 83). She recounted that she did all the grooming, performed the bookkeeping tasks, made appointments, and answered the phone (Tr. at 112). However, plaintiff's earnings statement reported only marginal income for the years 1967 through 1984. To illustrate, the earnings statement showed income of $1,642.79 for 1967. At $1.95 an hour, that would mean that plaintiff worked less than 25 weeks in 1967. In 1972, she earned $948.87 or worked about 12 weeks. In 1973, plaintiff earned $55.20 or worked less than one week. For the period she was earning 50% commission (i.e., January 1980 to June 1987), plaintiff earned income only in 1984, which is shown as $2,109.26. There are essentially only two conclusions one can draw from this evidence: either plaintiff operated a largely unsuccessful business enterprise for 20 years or her descriptions of the nature and extent of the work are highly inflated and not credible. The latter conclusion seems the more reasonable, and again it adversely reflects on plaintiff's credibility when she complains of disabling neck and back pain.

### C. RESIDUAL FUNCTIONAL CAPACITY

Finally, plaintiff argues that the ALJ erred in failing to obtain the testimony of a vocational expert. Defendant argues that when the ALJ properly determines that the claimant's nonexertional impairments do not prevent the claimant from performing the full range of work contemplated by the guidelines, he is not required to consult with a vocational expert and may properly rely on the vocational guidelines at step five.

Clearly the government's argument is an accurate statement of the law. However, for an ALJ to use the vocational guidelines, he or she must have an accurate residual functional capacity. In this case, Dr. Mruzik, a treating physician, assessed plaintiff's residual functional capacity (albeit after the ALJ rendered his opinion) coming to a different conclusion than Dr. Piley who assessed plain-

tiff's residual functional capacity for the government. The differences are as follows:

| | Plaintiff's Dr. | Defendant's Dr. |
|---|---|---|
| Frequently lift/carry | 10 pounds | 25 pounds |
| Occasionally lift/carry | 10 pounds | 50 pounds |
| Stand/walk in an 8–hour day | 2 hours total, less than 30 minutes continuously | 6 hours total |
| Sit in an 8–hour day | 2 hours total, less than 1 hour continuously | 6 hours total |
| Push/Pull | Limited due to muscular pain | Limited in upper extremities only |
| Reaching | Limited | Limited |

The Appeals Council had Dr. Mruzik's assessment before it, yet declined to review plaintiff's case.

Had Dr. Mruzik's assessment of plaintiff been substantially similar to Dr. Riley's, the ALJ's reliance on the vocational guidelines would be entirely proper. However, in this case, Dr. Mruzik, a treating physician, found plaintiff's residual physical functional capacity to be substantially different than Dr. Riley—a non-treating PEDIATRICIAN.

Therefore, I find that the ALJ's decision at the fifth step of the sequential analysis is not supported by substantial evidence in the record as a whole. There is nothing in the record indicating why Dr. Mruzik's assessment should be discounted and certainly nothing indicating why the assessment of a non-treating pediatrician should be given more weight than that of a treating physician.

### VIII. CONCLUSION

I find that the ALJ's decision is not supported by substantial evidence in the record as a whole. Therefore, it is

ORDERED that plaintiff's motion for remand is granted, the decision of the ALJ is reversed, and this case is remanded for (1) obtaining a residual physical functional capacity assessment by a medical doctor knowledgeable in the area of adult joint pain, (2) the taking of testimony from a vocational expert if necessary depending upon the residual physical functional capaci-

ty assessment and the ALJ's determination of plaintiff's residual functional capacity after considering the assessment of Dr. Mruzik, and (3) a more thorough analysis of plaintiff's credibility using the material currently in the record.